Argued and submitted November 18, 2019, reversed and remanded April 21, 2021

Laurie CUMMING,
*Plaintiff-Appellant,*

*v.*

Laurie NIPPING
and Kent Nipping,
*Defendants-Respondents.*

Lane County Circuit Court
161224954; A168015

489 P3d 119

This case is on appeal for the second time. Plaintiff brought a claim against defendants for unjust enrichment, asserting that plaintiff's stepmother had wrongfully transferred $300,000 in trust assets to defendants. After a bench trial, the trial court denied plaintiff's claim. In the first appeal, the Court of Appeals concluded that the trial court had applied the wrong legal standard, vacated the judgment, and remanded for further proceedings. Under the correct legal standard, to prevail on an unjust enrichment claim in circumstances like these, the plaintiff must prove that (1) property or a property interest that rightfully belongs to the plaintiff was taken or obtained by someone else under circumstances that in some sense were wrongful or inequitable; (2) the person who now possesses the property is not a bona fide purchaser for value and without notice; and (3) the property upon which the plaintiff seeks to impose a constructive trust is the property that rightfully belongs to the plaintiff or is a product of or substitute for it. On remand, on the same record, the trial court again denied plaintiff's claim. *Held*: The trial court erred in its application of the legal standard to this record.

Reversed and remanded.

Jay A. McAlpin, Judge.

James R. Cartwright argued the cause and filed the briefs for appellant.

Brian J. Millington argued the cause for respondents. Also on the brief were Julian W. Marrs and Thorp, Purdy, Jewett, Urness & Wilkinson, P.C.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

AOYAGI, J.

Reversed and remanded.

Tookey, J., dissenting.

**AOYAGI, J.**

This case, which arises from a dispute regarding trust property, is on appeal for the second time. Plaintiff brought an action against defendants for unjust enrichment, asserting, essentially, that the trustee wrongfully transferred $300,000 in trust assets to defendants. After a bench trial, the trial court denied plaintiff's claim. In the first appeal, we vacated and remanded for further proceedings, holding that the court had not correctly analyzed plaintiff's claim. *Cumming v. Nipping*, 285 Or App 233, 395 P3d 928 (2017) (*Cumming I*). On remand, on the same record, the court again denied plaintiff's claim, and plaintiff again appeals. For the following reasons, we reverse and remand.

## I.   STANDARD OF REVIEW

Unjust enrichment is an equitable doctrine. *Wilson v. Gutierrez*, 261 Or App 410, 411, 323 P3d 974 (2014). However, plaintiff does not request *de novo* review, nor do we exercise our discretion to provide it. *See* ORS 19.415(3)(b) (granting "sole discretion" to the Court of Appeals whether to allow *de novo* review in equitable proceedings). We are therefore bound by the trial court's factual findings if they are supported by any evidence in the record, *Wilson*, 261 Or App at 411, and state the facts accordingly. We review the trial court's legal conclusions for errors of law. *Id*.

## II.   FACTS

We summarize only the most pertinent facts, noting that we have already recounted some of the facts in our first opinion. *See Cumming I*, 285 Or App at 234-35.

During their marriage, plaintiff's father and stepmother created a trust. When father died in 1999, the trust split into two trusts, Trust A, a revocable trust known as the survivor's trust, and Trust B, an irrevocable trust known as the tax credit trust. Stepmother had unlimited access to both the income and the principal from Trust A. Her access to Trust B was more limited. Under the trust instrument, the trustee could use "as much of the net income" from Trust B "as the trustee, in the trustee's discretion, shall deem necessary for [stepmother's] proper health, maintenance, support and education," taking into consideration stepmother's

other income and resources as the trustee deems advisable. Regarding the *principal* of Trust B, the trust instrument provided:

> "*If the trustee deems income payments to be insufficient*, the trustee shall, from time to time, pay to or apply for the benefit of the surviving trustor, a sum out of the principal of Trust B as the trustee, in the trustee's discretion, deems necessary for the trustor's *proper health, maintenance, support and education*. Such payment may be made after Trust A has been exhausted, or before Trust A is exhausted."

(Emphases added.)

At all relevant times, the only asset in Trust B was a condominium in California known as "Seagate," where father had resided with plaintiff's mother and, later, stepmother. Under the terms of the trust, as a beneficiary of Trust B, stepmother had the right to continue to live at Seagate, rent-free, for so long as she desired. Further, the trustee—who was stepmother herself during the time relevant to this appeal—could sell Seagate and buy a replacement home of comparable or lesser value, if stepmother wished. The trustee also had discretion to encumber Seagate with a mortgage "for any valid trust purpose." Upon stepmother's death, the assets in Trust B were to go to plaintiff and plaintiff's children, subject to any valid encumbrances.

Stepmother resided at Seagate until 2008, when she moved to Oregon to be closer to defendants. Defendant Laurie Nipping is stepmother's granddaughter, and defendant Kent Nipping is Laurie's husband. Stepmother was close to Laurie Nipping, who had moved to Oregon in 2005. Upon arriving in Oregon, stepmother briefly lived with defendants and then moved into an assisted living facility as she had planned. While stepmother was living in Oregon, defendants managed her finances, helped her with moves, and occasionally ran errands for her. Stepmother's living expenses were fully covered by her pension and Social Security income. Additionally, stepmother received $2,000 in monthly rental income from Seagate, effectively as income payments from Trust B. According to defendant Laurie Nipping, stepmother had over $100,000 in her personal accounts as of October 2010.

In 2010, defendants were looking to move closer to Portland with their four children, and they raised with stepmother the possibility of her moving as well and their living together. Laurie Nipping wanted stepmother to live with them for "however long she had left." Defendants eventually found a farmhouse property in disrepair—the Kropf property—that they thought would be perfect if they fixed it up, because it was big enough for stepmother to have her own area. At some point, however, they discovered that the property did not qualify for conventional financing, due to its condition and other circumstances, and had to be purchased for cash. Needing to act quickly to get ahead of other buyers, defendants suggested that stepmother borrow $300,000 against Seagate to purchase it. At the time, defendants were aware that Seagate was held in trust but did not know the terms of the trust. Stepmother agreed, saying, "Sure, honey. That's fine." Defendants, who handled stepmother's finances, then handled the "details." Stepmother (presumably acting through defendants) took Seagate out of the trust—transferring title from the trust to stepmother personally—to obtain a mortgage on Seagate in stepmother's name. That enabled stepmother to obtain $300,000 in cash, which was the approximate purchase price of the Kropf property. Seagate was then put back into the trust, via another change of title, but now encumbered by a $300,000 mortgage.

Stepmother used the $300,000 to buy the Kropf property in October 2010, deeding a one-half interest to herself personally and a one-half interest to defendants. Defendant Laurie Nipping viewed the one-half interest that she and her husband received as a "gift" from stepmother. As for stepmother's personal half-interest, stepmother's will provided for defendants to inherit it upon stepmother's death, although there is no evidence that defendants were aware of that provision of stepmother's will. It should be noted that stepmother was found to be mentally competent at all relevant times and not unduly influenced by defendants.

Defendants proceeded to renovate the Kropf property, including setting up a bedroom, sitting room, and bathroom for stepmother's use. Defendants took $50,000

out of stepmother's personal accounts to pay for renovations. Defendants also spent "more than $50,000" of their own money on renovations. Defendants lived in a trailer on the property during the renovations, which they anticipated would take about three months. The plan was for stepmother to move in on February 1, 2011.

In late December 2010, however, stepmother became ill and was hospitalized. She was released from the hospital on December 25, 2010, into hospice care. Rather than return to her assisted living facility, stepmother spent that night at the Kropf house with defendants, passing away on December 26, 2010. It was the only night she stayed at the property.

After stepmother's death, defendants inherited stepmother's personal one-half interest in the Kropf property, under the terms of her will. Meanwhile, plaintiff obtained title to Seagate. Defendant Laurie Nipping, the successor trustee, was not involved in the transfer of Seagate's title to plaintiff; rather, there is evidence that plaintiff improperly effectuated the transfer of title on her own. Sometime thereafter, plaintiff discovered the $300,000 mortgage on Seagate, after it had gone unpaid for nearly a year, such that Seagate was about to go into foreclosure. Plaintiff filed this action, asserting, as relevant here, that defendants had been unjustly enriched by stepmother's violation of the trust terms. For relief, plaintiff prayed that defendants be required to pay off the promissory note and reimburse any note payments made by plaintiff, or, alternatively, that the Kropf property be recognized as subject to a constructive trust.

The matter was tried to the court, and, as described in our first opinion, the trial court denied plaintiff's unjust-enrichment claim. *Cumming I*, 285 Or App at 235-37. On appeal, we vacated the judgment and remanded for a correct analysis of plaintiff's claim under the legal standard articulated in *Tupper v. Roan*, 349 Or 211, 243 P3d 50 (2010). *Cumming I*, 285 Or App at 241-42.

On remand, the trial court undertook to apply the *Tupper* standard, including making factual findings based on the existing trial record. As discussed in more detail

below, the trial court again denied plaintiff's claim. Plaintiff again appeals, assigning error to the dismissal of her claim.[1]

## III.   ANALYSIS

As discussed in *Cumming I*, the Supreme Court in *Tupper* "articulated three specific requirements that a plaintiff must establish to prevail in asserting an unjust enrichment claim where, as here, the plaintiff has alleged that the defendant (a third party) acquired title to which the plaintiff holds a superior right." *Cumming I*, 285 Or App at 240. Plaintiff must establish (1) "that property or a property interest that rightfully belongs to her was taken or obtained by someone else under circumstances that in some sense were wrongful or inequitable"; (2) "that the person who now possesses the property is not a bona fide purchaser for value and without notice"; and (3) that the property upon which the plaintiff seeks to impose a constructive trust is in fact, by clear and convincing evidence, "the very property that rightfully belongs to her, or is a product of or substitute for that property." *Id.* at 240-41. We address each requirement in turn, to determine whether the trial court erred in dismissing plaintiff's claim.

### A.   *Wrongful or Inequitable Circumstances*

To prevail on her unjust-enrichment claim, plaintiff first had to prove that defendants obtained a property interest that rightfully belonged to her "under circumstances that in some sense were wrongful." *Cumming I*, 285 Or App at 240. Wrongfulness must be grounded in recognized legal principles, rather than "abstract notions of morality." *Id.* at 239. In this case, whether the circumstances were wrongful comes down to whether, when stepmother took $300,000 in assets out of the principal of Trust B, she was acting within her discretion as trustee or, instead, was violating the terms of the trust. *See id.* at 241 (describing the trial court's task as being to "determine whether the trust allowed stepmother

---

[1] In a second assignment of error, plaintiff challenges the trial court's interpretation of the trust instrument, as relevant to its reasoning for dismissing plaintiff's claim. We address that issue as part of the first assignment of error. *See Cedartech, Inc. v. Strader*, 293 Or App 252, 256, 428 P3d 961 (2018) ("The assignments are criticisms of the trial court's *reasons* for its result but are not truly *rulings* of the trial court of the sort that are required to be identified in an assignment of error." (Emphases in original.)).

to encumber Seagate and, if so, under what terms," and whether stepmother's "actions comported with those terms").

California law controls that determination, because the trust provides that it is governed by California law. Under California law, "the trustee has a duty to administer the trust according to the trust instrument." Cal Prob Code § 16000. "In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it." *Scharlin v. Superior Court*, 9 Cal App 4th 162, 168, 11 Cal Rptr 2d 448, 452 (1992). "Ordinary words must be given their normal, popular meaning and legal terms are presumed to be used in their legal sense." *Id*. "The trustee also must deal impartially with all beneficiaries," and, if "given discretionary power, the trustee must exercise his or her power reasonably." *Penny v. Wilson*, 123 Cal App 4th 596, 603, 20 Cal Rptr 3d 212, 216 (2004). "Even if a trustee is given 'sole' and 'absolute' discretion, he or she must act in accordance with fiduciary principles and must not act in bad faith or in disregard of the purposes of the trust." *Id*.

Here, the trial court concluded that stepmother had acted within her discretion as trustee when she borrowed $300,000 against a trust asset, used it to buy the Kropf property, and then deeded one-half ownership to herself personally and one-half ownership to defendants. In particular, the court concluded that stepmother was allowed to take those actions because the trust instrument gave her discretion to use trust assets as necessary for her health, education, maintenance, and support (HEMS), including encumbering trust assets. The court concluded that stepmother's purchase of the Kropf property was a "valid exercise of that discretion," and it opined that to conclude otherwise would require second-guessing stepmother's decision about how best to care for herself or would "illogically restrict[]" the meaning of "health, maintenance or support." As for the connection between stepmother's purchase of the Kropf property and her health, maintenance, or support, the trial court found that stepmother was acting according to an implied agreement with defendants, by which defendants implicitly committed to "care for, support, and maintain [stepmother] in her remaining years" and to "provide

companionship, security and consistency" for a potentially extended period.

We agree with plaintiff that the trial court's analysis misapplies the legal standard. Under the terms of the trust, stepmother as trustee had broad discretion to use the net income from Trust B assets—*i.e.*, the Seagate rental income—as she deemed necessary for her HEMS needs. She had less discretion, however, to invade the principal. Only if stepmother deemed income payments "insufficient" to provide for her HEMS needs could she invade the trust principal. On this record, there is no evidence that the income payments were insufficient to provide for stepmother's HEMS needs or, more importantly, that stepmother ever deemed them so. The mere fact that stepmother *agreed* to invade the principal to buy the Kropf house does not, in and of itself, establish that the condition precedent for invading the principal was met.

It is undisputed that stepmother had sufficient income to fully cover her living costs and bills, which she used for that purpose. Of course, stepmother was free to change her living arrangement, if she so wished. It does not follow, however, that stepmother could simply withdraw $300,000 from the Trust B principal to buy a second home and deed it half to herself and half to someone else.

The trust specifically provided that stepmother could sell Seagate and buy a replacement home of comparable or lesser value, which replacement home would necessarily be a trust asset. Instead, stepmother transferred Seagate out of the trust just long enough to get a mortgage in her own name, and then used the resulting $300,000 to buy the Kropf property, deeding a half-interest to herself personally and a half-interest to defendants.[2] That approach clearly

---

[2] Because Seagate was owned by the trust, not stepmother, it presumably had to be taken out of trust for stepmother to get a mortgage in her own name. It does not follow that the only way to encumber Seagate was to take it out of trust—something that no one argues but that the dissent assumes. *See* 310 Or App at 807-08, 812 (Tookey, J., dissenting). If the terms of the trust had been followed, the trustee presumably could have sold or encumbered Seagate while leaving it in trust. The dissent's assumption to the contrary is untethered to any cited principle of trust law or real estate law, and we disagree that plaintiff had the "burden" to foresee and disprove the dissent's unexplained assumption. *See id.* at 808 n 6 (Tookey, J., dissenting).

was not what the trust contemplated in terms of acquisition of a replacement home. Using trust assets to buy real property in stepmother's own name was also inconsistent with a trust provision that expressed an overriding intent to keep Trust B assets from being included in stepmother's estate for federal estate tax purposes, including providing that, regardless of any other trust provisions, stepmother was not to take any action or have any power as trustee that would lead to that result.

Setting to the side the replacement-home issue, there is no evidence that stepmother deemed it necessary to providing for her HEMS needs that she buy real property and deed it to herself and defendants. While stepmother was living in an assisted-living facility in Oregon, defendants told her that they wanted her to live with them and be part of their family. Defendants became interested in the Kropf property, which they thought would be perfect because it was big enough to house defendants and their four children while also giving stepmother her own area. When defendants learned that it had to be a cash purchase, due to the property's condition, they suggested to stepmother that she borrow $300,000 against Seagate. They knew Seagate was in trust but did not know the terms, and they needed to act fast to beat out other offers. Stepmother agreed, and defendants handled the details. Thus, stepmother certainly agreed to take $300,000 out of Trust B principal to buy property where she eventually intended to live with defendants. However, there is no evidence that defendants' offer to live with stepmother was made contingent upon her giving them a 50-percent or 100-percent interest in the Kropf property or otherwise paying them. To the contrary, the only evidence is that defendants approached stepmother about living together out of familial feeling and, when she subsequently deeded them a one-half interest in the Kropf property, they viewed it as a "gift." And there is no evidence that defendants were even aware that stepmother had provided in her will for them to inherit stepmother's one-half interest in the property.

Similarly, there is no evidence that, in deciding to live together, defendants were agreeing to provide any type of care or support to stepmother, beyond the love of family.

Agreeing to live with an elderly person does not in and of itself constitute an agreement to provide for the person's HEMS needs. When defendants talked to stepmother about living together, she was receiving the lowest level of care offered at the assisted-living facility, she had always paid for her own HEMS needs, and she had significant assets to continue doing so. On this record, it is impermissibly speculative to infer an implied agreement by defendants to assume responsibility for stepmother's HEMS needs in exchange for $150,000 or $300,000 of real property. Defendant Laurie Nipping testified that what she expected from living together was simply being able to "have coffee together, have a glass of wine together," and "just do[] life together," instead of "coming and going and having short little visits." The issue here is not whether defendants should be financially rewarded for their kind treatment of an older relative, so as to incentivize kind treatment of older relatives. The issue is whether the trustee (stepmother) complied with the terms of the trust instrument created by stepmother and plaintiff's father, when she encumbered Seagate in the manner that she did. *See Cumming I*, 285 Or App at 241.

We conclude that the trustee (stepmother) did not comply with the terms of the trust. The evidence does not allow a reasonable inference that the condition precedent for invading Trust B principal had been met—that is, that the trustee had deemed the Trust B income payments "insufficient" to meet stepmother's HEMS needs and deemed it "necessary" to invade the principal to provide for those needs. Relatedly, the evidence does not permit a finding that stepmother and defendants had agreed not only to live together but that defendants would be responsible for stepmother's care, maintenance, and support in exchange for an immediate one-half-interest in the Kropf property and a future one-half interest to be acquired by devise.[3] The trial court

---

[3] Given our conclusions, we need not address whether it would have been an abuse of discretion for stepmother to invade principal in the manner that she did *even if* she had deemed it necessary and had an agreement with defendants to provide for her care. *See Penny*, 123 Cal App 4th at 603, 20 Cal Rptr 3d at 216 (If "given discretionary power, the trustee must exercise his or her power reasonably," and, "even if a trustee is given 'sole' and 'absolute' discretion, he or she must act in accordance with fiduciary principles and must not act in bad faith or in disregard of the purposes of the trust."). Regarding reasonableness, defendants

therefore erred in concluding that stepmother's invasion of the trust principal to buy the Kropf property and deed it to herself and defendants comported with the terms of the trust.

Because stepmother failed to act in conformity with the terms of the trust, the circumstances in which she used trust assets to buy the Kropf property "in some sense were wrongful," satisfying the first *Tupper* requirement. *Cumming I*, 285 Or App at 240. Again, we refer to wrongfulness by reference to recognized legal principles, not "abstract notions of morality." *Id.* at 239.

## B.  *Bona Fide Purchasers without Notice*

Having concluded that plaintiff established the first requirement, we proceed to the second *Tupper* requirement: establishing that defendants were not "bona fide purchaser[s] for value and without notice." *Id.* at 240. That requirement is rooted in the constructive trust remedy. *See Tupper*, 349 Or at 220-22. When property subject to a constructive trust is transferred to a third party, if the third party is a "mere volunteer" or had "actual or constructive notice of the trust, then the rule is universal that such heir, devisee, successor, or other voluntary transferee, or such purchaser with notice, acquires and holds the property subject to the same trust which before existed, and becomes himself a trustee for the original beneficiary." *Id*. at 221 (ellipses omitted). "It is not necessary that such transferee or purchaser should be guilty of positive fraud, or should actually intend a violation of the trust obligation; it is sufficient that he acquires property upon which a trust is in fact impressed, and that he is not a bona fide purchaser for a valuable consideration and without notice." *Id*. (internal quotation marks omitted).[4]

---

cite *Hollis v. Helton*, 2005 WL 2496874 (Cal Ct App 2005) (unpublished disposition), as noncontrolling but "persuasive authority for what California courts consider appropriate invasions of trust principal for a person's 'health.'" But *Hollis* is starkly different from this case, such that it lends no support to defendants' position, even if we viewed it as persuasive authority. *See* California Rules of Court, Rule 8.1115(a) (precluding citation to or reliance on unpublished opinions).

[4] As an "alternative basis" to affirm the dismissal of plaintiff's claim, defendants argue that, even if stepmother did not comply with the terms of the trust, plaintiff cannot obtain relief against defendants and should have brought a claim against stepmother or her estate. We reject that argument as contrary to the principles articulated in *Tupper*. Unless defendants were bona fide purchasers without notice, they cannot rely on their third-party status to defeat a constructive trust.

Here, the trial court determined that defendants were bona fide purchasers for value, having "contributed substantial money and labor to make the Kropf property habitable for [stepmother]." The court did "not find dispositive" defendant Laurie Nipping's testimony that she considered the one-half interest that defendants received in the Kropf property in 2010 a "gift," because, in the court's view, there was evidence that stepmother's "plan" to use the Kropf property to provide for her health, maintenance, or support depended on defendants expending money and labor to make the house habitable. The trial court did not address the "without notice" portion of the standard, nor do the parties address it on appeal. We therefore limit our discussion to whether there was evidence to allow a determination that defendants were bona fide purchasers "for value."

We agree with plaintiff that the trial court erred in concluding that defendants were bona fide purchasers for value based on stepmother's "plan." There is ample evidence that defendants and stepmother planned to live on the Kropf property together, that defendants were tasked with making the house habitable, and that defendants supplied labor and used some of their own money toward that end. It does not follow that defendants were bona fide purchasers for value. Unlike the trial court, we view as legally dispositive defendant Laurie Nipping's testimony that the one-half interest in the Kropf property that defendants received in 2010 was a "gift." That evidence—which the court implicitly found credible, just not "dispositive"—precludes any nonspeculative inference that there was an agreement between stepmother and defendants that defendants would renovate the house and live there with stepmother *in exchange for* stepmother giving defendants an ownership interest in the Kropf property.[5] In taking on renovation of the property, defendants may have expected to live there rent-free for the

---

[5] The dissent emphasizes the fact that, for many years, defendant Laurie Nipping had visited stepmother, provided companionship to her, and done things for her. *See, e.g.*, 310 Or App at 806-09 (Tookey, J., dissenting). It is certainly reasonable to presume that defendants expected that to continue. It is also reasonable to presume that defendants intended to include stepmother in their family meals and the like if they lived together. But it does not follow that an implied agreement existed by which stepmother had to give defendants $300,000 for their continued familial support.

remainder of stepmother's life or had other personal motiva-
tions. In any event, the evidence did not allow a determina-
tion that they were bona fide purchasers for value.[6]

### C.   *Property that Rightfully Belongs to Plaintiff*

That leaves the third *Tupper* requirement. Plaintiff
had to establish by clear and convincing evidence that the
Kropf property—which is the property on which plaintiff
seeks to impose a constructive trust—"in fact is the very
property that rightfully belongs to her, or is a product of
or substitute for that property." *Cumming I*, 285 Or App
at 240-41. The trial court did not expressly address that
requirement. However, it is undisputed—and, on this record,
indisputable—that the $300,000 obtained by mortgag-
ing Seagate in 2010 was used to purchase the Kropf prop-
erty. Defendants, who managed stepmother's finances and
handled the Seagate refinancing and the Kropf purchase,
expressly testified that that is what happened. Closing
documents confirm that is what happened. As the record
allows for only one possible finding as to the third *Tupper*
requirement, we conclude that plaintiff satisfied the third
requirement.[7]

### D.   *Alternative Basis to Affirm (Unclean Hands)*

In light of the foregoing analysis, the trial court
erred in concluding that plaintiff had not proved each of
the three *Tupper* requirements. As an "alternative basis"
to affirm, defendants argue that, even if plaintiff otherwise
proved unjust enrichment, we should affirm the dismissal
of her claim, based on plaintiff having "unclean hands."
Specifically, defendants assert that plaintiff took improper

---

[6] Of course, plaintiff's claim pertains only to the $300,000 borrowed against
Seagate and used to purchase the Kropf property. To the extent that defendants
used their own money, their own labor, and stepmother's personal funds to reno-
vate the Kropf property, they will receive the benefit of those improvements.

[7] We note that, under the terms of the trust instrument, stepmother as
trustee had the authority to change the trust beneficiaries and, as such, could
have changed the beneficiary of Trust B from plaintiff to defendants, at which
point defendants would have received Seagate upon stepmother's death. The
trustee did *not* change the beneficiary of Trust B, however, whether to honor her
late husband's wishes or otherwise. As such, the theoretical possibility that she
could have changed beneficiaries has no effect on plaintiff's actual beneficiary
status or, more generally, on the correct construction of the trust terms regarding
invasion of Trust B principal.

actions to transfer the title to Seagate to herself after stepmother's death. *See* 310 Or App at 797.

"Under the doctrine of unclean hands, a court may refuse to grant equitable relief to a party who has engaged in misconduct in connection with the matter for which he or she seeks relief." *Burgdorf v. Weston*, 259 Or App 755, 764, 316 P3d 303 (2013), *rev den*, 355 Or 380 (2014). The misconduct must be serious enough to justify denying relief on an otherwise valid claim—such as engaging in a crime, fraud, or bad faith—as "[e]ven equity does not require saintliness." *Id.* (internal quotation marks omitted). The party who stands to benefit from invocation of the unclean-hands doctrine also "must prove that he or she has suffered actual injury due to the alleged misconduct." *Id.* Here, even assuming *arguendo* that plaintiff's conduct was of a nature that would permit application of the doctrine, defendants have not identified any actual injury that they have suffered as a result of plaintiff's conduct. It is undisputed that plaintiff and her children were legally entitled to receive title to Seagate after stepmother's death, plaintiff's children have purported to transfer their interests to plaintiff, and defendants have offered no evidence of any injury caused to them by the particular manner in which Seagate's title was transferred. We therefore reject plaintiff's proposed alternative basis to affirm.

Reversed and remanded.

**TOOKEY, J.,** dissenting.

**"There is no medicine like hope, no incentive so great, and no tonics so powerful as expectation of something better tomorrow." Dr. Orison Swett Marden, as quoted in *Bits and Pieces*, Vol. F/No. 41, at 14.**

On December 26, 2010, Ruth Whiteneck, at an advanced age, died in the farmhouse that she had purchased to live in with her family for "however long she had left." She died in the bedroom that her granddaughter and granddaughter's husband had renovated for her use. At her side when she died was her granddaughter, Ms. Nipping; her granddaughter's husband, Mr. Nipping; and one of her

great-grandchildren, H. Nipping. Absent was the plaintiff in this case, Ms. Cumming.

I would affirm the trial court's decision, and I dissent in this case because I believe the majority gives too short shrift to what it describes as "familial feeling." 310 Or App at 788. In my view, Ms. Whiteneck's actions—purchasing a property to live in with her granddaughter and great-grandchildren—were appropriate under the terms of the trust that she and her late husband had designed. As discussed below, the trust allowed for whichever one of them survived the other to withdraw from the principal of the trust, as needed, to provide for their health, education, maintenance, and support, as the survivor grew older and developed the infirmities of advanced age that inevitably follow.

In reviewing the trial court's ruling in this case, I am mindful of our standard of review: We "review the trial court's legal conclusions for legal error and review its factual findings to determine whether those findings are supported by any evidence in the record." *Multi/Tech Eng. Svcs. v. Innovative Des. & Constr.*, 274 Or App 389, 394-95, 360 P3d 701 (2015) (internal quotation marks omitted). In so doing, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Wilson v. Gutierrez*, 261 Or App 410, 411, 323 P3d 974 (2014) (brackets and internal quotation marks omitted).[1]

## I.   FACTS AND PROCEDURAL HISTORY

I first turn to the facts. In my view, understanding Ms. Whiteneck's decades-long relationship with her granddaughter, Ms. Nipping, and the Nipping family, is essential to understanding Ms. Whiteneck's decision to withdraw trust principal, why withdrawing trust principal was

---

[1] At the outset, I note that in this dissent I refer to individuals by their names, rather than their role in the litigation or their relationship to the parties to this litigation. I do so for two reasons: First, defendants—Ms. Nipping and Mr. Nipping—had different parts in the events that gave rise to this litigation. Second, although Ms. Whiteneck had the relationship of "stepmother" to Ms. Cumming, 310 Or App at 781, she was "grandma" to Ms. Nipping.

authorized under the terms of the trust, and the inferences that the trial court permissibly drew from the evidence.[2]

A.    *Trusts, the Whitenecks, the Nippings, and Ms. Cumming*

After Ms. Nipping was born, she went from the hospital to Ms. Whiteneck's home, where Ms. Whiteneck served as Ms. Nipping's primary caregiver for the first couple years of Ms. Nipping's life; Ms. Whiteneck cared for Ms. Nipping after Ms. Nipping's mother returned to work. Ms. Nipping and Ms. Whiteneck remained close throughout Ms. Nipping's childhood.

In the 1970s, Ms. Cumming's mother passed away and, shortly thereafter, Ms. Cumming's father married Ms. Whiteneck. Ms. Cumming's father, Mr. Whiteneck, had only one child. Ms. Whiteneck had three children from a prior marriage. Ms. Whiteneck and Mr. Whiteneck lived in a condominium in California known as "Seagate."

In May 1991, Ms. Whiteneck and Mr. Whiteneck set up a revocable living trust. Eight years later, in 1999, Mr. Whiteneck passed away. Ms. Cumming and her husband were with Mr. Whiteneck when he passed, and they stayed with Ms. Whiteneck that night. The next day, Ms. Nipping came to take care of Ms. Whiteneck. The day after Mr. Whiteneck's death in 1999 was the last day that Ms. Cumming ever saw or spoke to Ms. Whiteneck.

---

[2] I pause to note that I am in full agreement with the majority that the "issue here is not whether defendants should be financially rewarded for their kind treatment of an older relative, so as to incentivize kind treatment of older relatives." 310 Or App at 789.

I also agree with the majority that the issue in this case, instead, is "whether [Ms. Whiteneck] complied with the terms of the trust instrument created by [Ms. Whiteneck] and plaintiff's father, when she encumbered Seagate in the manner that she did." *Id.* at 789. That inquiry, however, turns on what inferences the trial court, as a legal matter, could have permissibly drawn from the evidence presented at trial, including evidence regarding the relationships between Ms. Whiteneck and her family members. Indeed, as noted by the majority, the trial court found "that [Ms. Whiteneck] was acting according to an implied agreement with defendants, by which defendants implicitly committed to 'care for, support, and maintain [Ms. Whiteneck] in her remaining years' and to 'provide companionship, security and consistency' for a potentially extended period." 310 Or App at 786-87. In my view, to determine whether that finding was permissible, it is necessary to consider the evidence presented at trial concerning the relationships and bonds at issue between Ms. Whiteneck and her family members, and in particular, the relationship and bonds between Ms. Whiteneck and the Nippings.

During the trial in this case, Ms. Cumming described her relationship with Ms. Whiteneck as "cordial"; Ms. Whiteneck, however, perceived Ms. Cumming as "just waiting for her to die." Prior to Mr. Whiteneck's death, events had taken place at Seagate that left Ms. Whiteneck with the impression that Ms. Cumming was "very concerned" with what she would receive after Mr. Whiteneck and Ms. Whiteneck died.

Pursuant to the terms of the Whitenecks' revocable living trust, Mr. Whiteneck's death resulted in the revocable living trust being separated into two trusts—Trust A and Trust B—of which Ms. Whiteneck was both the trustee and a beneficiary.

With regard to Trust A, known as the survivor's trust, Ms. Whiteneck was entitled to "all income and principal without limitation."

Trust B, known as the tax credit trust, was structured differently. With regard to the income from Trust B, Article 2.10 of the trust provided that the trustee "shall pay to or apply for the benefit of the surviving trustor, as much of the net income as the trustee, in the trustee's discretion, shall deem necessary for the surviving trustor's proper health, maintenance, support and education," taking into consideration, "to the extent the trustee shall deem advisable, any other income or resources of the surviving trustor known to the trustee and reasonably available for these purposes."

With regard to the principal from Trust B, Article 2.11 provided:

> "DISCRETION TO INVADE PRINCIPAL  *If the trustee deems income payments to be insufficient*, the trustee shall, from time to time, pay to or apply for the benefit of the surviving trustor, a sum out of the principal of Trust B *as the trustee, in the trustee's discretion, deems necessary for the trustor's proper health, maintenance, support and education*. Such payment may be made after Trust A has been exhausted, or before Trust A is exhausted."

(Emphases added.)

Importantly, as alleged in Ms. Cumming's complaint, Seagate was allocated to Trust B, and Seagate became the only asset of Trust B after the Whitenecks' assets were allocated between the two trusts and the expenses relating to Mr. Whiteneck's death were paid.

At the time of Mr. Whiteneck's passing, Ms. Nipping lived in Newberry Park, California, which was about an hour and a half away from Seagate. In 2000, Ms. Nipping moved to Agoura Hills, California, which is about an hour away from Seagate.

From the time of Mr. Whiteneck's death until 2005, Ms. Nipping and her children visited Ms. Whiteneck often. During visits they would frequently meet Ms. Whiteneck for lunch at Mimi's Café, because Ms. Whiteneck loved that restaurant, and then would spend the afternoon with her. In 2004, Ms. Whiteneck made Ms. Nipping the successor trustee of Trust B. At some point, though the exact date is unclear, Ms. Whiteneck told Ms. Nipping that Ms. Whiteneck had mild dementia.

In 2005, the Nippings moved to Oregon. After the Nippings moved to Oregon, they had conversations with Ms. Whiteneck about Ms. Whiteneck moving to Oregon as well. At that point, however, Ms. Whiteneck was not ready to leave Seagate. As time wore on, however, Ms. Whiteneck grew increasingly solitary in California and was not leaving her home with the same frequency as she had previously.

In 2007, Ms. Whiteneck fell and sustained an injury, after which Ms. Nipping traveled to California to see Ms. Whiteneck. Ms. Nipping arranged for a care provider to go to Ms. Whiteneck's home approximately once a week to generally check on Ms. Whiteneck and to spend time with her. The care provider "reported to" Ms. Nipping, not to Ms. Whiteneck.

Also, in 2007, the Nippings received a call from a "good friend" of Ms. Whiteneck who was concerned that Ms. Whiteneck was spending "a lot of time in her home by herself" and thought it would be a good time for Ms. Whiteneck to move to Oregon. In late 2007, Ms. Whiteneck agreed to move to Oregon, with the plan that she would live in an assisted

living facility in Oregon. At that point, Ms. Whiteneck was excited to move to Oregon to be closer to the Nipping family, who was then living in Creswell, Oregon. Ms. Whiteneck was experiencing some degree of difficulty with her memory at that time.[3]

In preparation for Ms. Whiteneck's move, the Nippings looked for assisted living facilities near to their home in Creswell in which Ms. Whiteneck could live. They decided that a facility named Lone Oak would be a good choice for Ms. Whiteneck because it was decorated similarly to Seagate, and they liked the location and the grounds.

In January 2008, Ms. Whiteneck moved to Oregon and, for a brief time, lived with the Nippings until a vacancy at Lone Oak opened up for Ms. Whiteneck. At that time, the Nippings' home did not have adequate room for Ms. Whiteneck to move in with them on a long-term basis.

After a vacancy at Lone Oak became available, Lone Oak required a medical appointment for Ms. Whiteneck, which Ms. Nipping also attended. During that medical appointment, Ms. Nipping provided information to the doctor regarding Ms. Whiteneck, telling the doctor that she believed Ms. Whiteneck's memory had been getting progressively worse over the course of the prior two years.

For a time after Ms. Whiteneck moved to Oregon, the Nippings visited her once or twice a week, and after that, they continued to visit her often. During those visits they would talk, play cards, and "just spend time with her."

Additionally, after Ms. Whiteneck moved to Oregon, the Nippings managed Ms. Whiteneck's finances for her—Ms. Nipping took responsibility for paying Ms. Whiteneck's bills (from Ms. Whiteneck's accounts) and writing Ms. Whiteneck's checks, and she was also put onto Ms. Whiteneck's checking account. Additionally, the Nippings arranged for Seagate to be rented and hired an accountant to do Ms. Whiteneck's taxes. Ms. Whiteneck's rental income from Seagate was "around" $2,000 a month.

---

[3] The record contains conflicting testimony regarding Ms. Whiteneck's mental acuity prior to her move to Oregon. For the purposes of this opinion, it suffices to note that Ms. Whiteneck had some level of difficulty with regard to memory.

After Ms. Whiteneck had been living at Lone Oak for about a year, the Nippings discovered an assisted living facility, Middlefield, that was much closer to their house, which would allow the Nippings to see Ms. Whiteneck more often. Ms. Whiteneck agreed to move to Middlefield in part to be closer to the Nipping family. Additionally, at Middlefield, Ms. Whiteneck would be able to have a one-bedroom apartment, whereas at Lone Oak, she only had a studio apartment. Ms. Whiteneck's bills and rent at Middlefield were paid for by pension benefits and social security Ms. Whiteneck received.

After Ms. Whiteneck moved to Middlefield, Ms. Nipping visited her at least once a week. Additionally, Ms. Whiteneck came to the Nippings' home for "all of the holidays" and, occasionally, "just to spend the day" with the Nippings. Ms. Nipping would also pick up Ms. Whiteneck from Middlefield so that Ms. Whiteneck could see her great-grandchildren's "evening activities," such as performances and music recitals; activities that Ms. Nipping thought would interest Ms. Whiteneck. Ms. Whiteneck read the newspaper every morning and cut out articles of interest to share with Ms. Nipping. One of Ms. Whiteneck's great-granddaughters checked Ms. Whiteneck's voicemails and messages for her when the great-granddaughter visited.

In 2009, Ms. Whiteneck went to the hospital and was diagnosed with congestive heart failure, after which Ms. Whiteneck "declined a bit" but then "bounced back."

Subsequently, the Nipping family discussed moving closer to the Portland, Oregon, area, because they believed that there would be more opportunities for their children to be involved in activities and that it would be beneficial to Mr. Nipping's business to be in a more metropolitan area; Mr. Nipping is an electrical contractor.

The Nippings discussed their plan to move closer to Portland with Ms. Whiteneck, and discussed Ms. Whiteneck moving too so that she could stay close to the Nipping family. Ms. Nipping thought that Ms. Whiteneck was "fine" with the move, because Ms. Whiteneck "knew at the time that she would be close" to the Nippings "wherever [they] went."

Initially, the Nippings thought that perhaps Ms. Whiteneck would move into a facility similar to Middlefield in the Portland area.

While searching for property closer to Portland, however, the Nippings found a farmhouse for sale on Kropf Road in Molalla, Oregon (the Kropf Property). They believed the Kropf Property presented a "perfect situation" because it would allow Ms. Whiteneck to live with the Nippings while still having her own space, giving her the ability to be "separate from all the chaos of the kids."[4] The Kropf Property had a separate bedroom with an adjoining sitting room, and a bathroom, which would be for Ms. Whiteneck's use. The Nippings took pictures of the Kropf Property and talked with Ms. Whiteneck about the possibility of moving in with the Nippings and being with them "24/7." Ms. Nipping told Ms. Whiteneck that she wanted Ms. Whiteneck to live with the Nippings for "however long she had left."

Ms. Nipping discussed the view that Ms. Whiteneck would have from her bedroom in the Kropf Property; being able to have coffee and a glass of wine together; and generally "doing life together," rather than "coming and going and having short little visits." Ms. Whiteneck looked forward to living with the Nippings.

At some point the Nippings discovered that, due to the condition of the Kropf Property, it was not eligible for a conventional loan and needed to be a "cash deal." Additionally, they had to move quickly if they wanted to purchase the Kropf Property—there were other offers on it, and they were worried that it would come off the market due to a foreclosure. As a result, they did not have time to wait for their home in Creswell to sell so that they could partially finance the purchase of the Kropf Property. Further, the money Ms. Whiteneck had in her saving and checking accounts, and the income from rental of Seagate, were not sufficient to purchase the Kropf Property. So, Ms. Whiteneck, after discussion with the Nippings, made the decision to encumber Seagate and use the proceeds from that encumbrance to purchase the Kropf Property.

---

[4] At that point, the Nippings had four children.

The title company utilized by Ms. Whiteneck and the Nippings explained that, for the transaction to work, Seagate needed to be removed from the trust, encumbered, and then placed back into the trust once it was encumbered. That is precisely what Ms. Whiteneck did.

Ms. Whiteneck was never "hesitant" about the transactions necessary to purchase the Kropf Property. She did, however, sometimes "forget" and need to be "reminded" about the transaction and that she would be moving in with the Nippings.

In October 2010, the transaction for the Kropf Property closed, and the property was deeded to Ms. Whiteneck and the Nippings. During trial, Ms. Nipping testified that she understood the interest that was in her and her husband's name to be a "gift" from Ms. Whiteneck.

The Nippings then moved into a trailer on the Kropf Property and lived in the trailer while they worked on renovating the Kropf Property, with the plan that it would be ready for Ms. Whiteneck to move into on February 1, 2011. The majority of the funds for the renovations came from the Nippings, and Mr. Nipping performed the labor, but Ms. Whiteneck also contributed funds for the renovations. Renovations undertaken by Mr. Nipping included renovations to Ms. Whiteneck's bedroom. During the renovations, Ms. Nipping showed Ms. Whiteneck photographs of the progress that the Nippings were making on the renovations, and Ms. Whiteneck responded that she loved what was being done to the property and that she was looking forward to being there.

But Ms. Whiteneck and the Nippings' plan did not come to fruition as intended.

On December 21, 2010, Ms. Whiteneck was having trouble breathing and went to the hospital. Ms. Nipping stayed with Ms. Whiteneck in the hospital overnight that night and, at that time, Ms. Whiteneck seemed "relatively normal." Ms. Nipping stayed with Ms. Whiteneck most of the following morning as well.

Ms. Nipping left the hospital on December 22, 2010, and returned on December 23, 2010, at which time she was

told that Ms. Whiteneck would be released and placed on hospice care. Ms. Whiteneck, at that point, could not return to Middlefield—the assisted living facility that she had been living in—because she needed to be on hospice care.

Ms. Nipping arranged for Ms. Whiteneck's transport to the Kropf Property, and Ms. Whiteneck arrived at the Kropf Property on Christmas Day. Also, on Christmas Day, a hospice nurse went to the Kropf Property and set up Ms. Whiteneck's room with a hospital bed, a commode, and "all of the things she felt they would need." Ms. Nipping talked to a hospice nurse for several hours about what Ms. Whiteneck would need and what Ms. Nipping would need to do for her. Ms. Nipping slept in Ms. Whiteneck's sitting room at the Kropf Property on Christmas night so that she could be close to Ms. Whiteneck.

Ms. Whiteneck passed away the next day—December 26, 2010. With her when she passed was Ms. Nipping, Mr. Nipping, and the Nippings' oldest daughter—Ms. Whiteneck's great-granddaughter.

After Ms. Whiteneck's death, her estate went through probate, and her interest in the Kropf Property was transferred to Ms. Nipping.

B.   *The Instant Litigation*

After Ms. Whiteneck's estate went through probate, Ms. Cumming brought suit against the Nippings, alleging claims of intentional interference with prospective inheritance and unjust enrichment. In its initial ruling, the trial court denied Ms. Cumming's claims.

With respect to the intentional interference with prospective inheritance claim, the trial court determined that Ms. Whiteneck "did not lack contractual capacity" and that the Nippings "did not exercise undue influence" over Ms. Whiteneck. With respect to the unjust enrichment claim, the trial court determined that it was not "inequitable or that it shocks the *** conscience that the defendants would retain the home," noting that, "if Ms. Whiteneck had not died when she did, if she had continued to live another ten years, I don't think there would have been an issue

whatsoever," and there was nothing "inequitable about allowing the defendants to retain what they have."

Ms. Cumming appealed, and, on appeal, we vacated the judgment and remanded as to Ms. Cumming's unjust enrichment claim for an analysis of the unjust enrichment claim under the legal standard articulated in *Tupper v. Roan*, 349 Or 211, 243 P3d 50 (2010). *Cumming v. Nipping*, 285 Or App 233, 241-42, 395 P3d 928 (2017) (*Cumming I*). We explained that, under *Tupper*, to "prevail in asserting an unjust enrichment claim where, as here, the plaintiff has alleged that the defendant (a third party) acquired property to which the plaintiff holds a superior right," a plaintiff must establish three elements. *Cumming I*, 285 Or App at 240. Of importance to this dissent is the first element: that "property or a property interest that rightfully belongs to [the plaintiff] was taken or obtained by someone else under circumstances that in some sense were wrongful or inequitable." *Id.* (internal quotation marks omitted). Because I would conclude that Ms. Cumming did not meet her burden of proving the first element, I do not consider the other two elements of her unjust enrichment claim in this dissent.[5]

On appeal in *Cumming I*, with respect to the first element of Ms. Cumming's unjust enrichment claim, we noted that Ms. Cumming needed to "demonstrate that she had a legal right to Seagate without any encumbrances." *Id.* at 241. We explained that, to analyze that issue, the trial court needed to "determine whether the trust allowed [Ms. Whiteneck] to encumber Seagate and, if so, under what terms" and that the court "then had to determine whether [Ms. Whiteneck's] actions comported with those terms." *Id.*

On remand, the trial court again denied Ms. Cumming's unjust enrichment claim. The trial court

---

[5] The other two elements of an unjust enrichment claim where, as here, the plaintiff has alleged that the defendant (a third party) acquired property to which the plaintiff holds a superior right, are that (1) "the person who now possesses the property is not a bona fide purchaser for value and without notice" and (2) the property upon which the plaintiff seeks to impose a constructive trust is in fact, by clear and convincing evidence, "the very property that rightfully belongs to her, or is a product of or substitute for that property." *Cumming I*, 285 Or App at 240-41.

determined that "Ms. Whiteneck's purchase of the Kropf property was for her health, maintenance or support"; the "terms of the trust left the decisions on how to best provide for her 'health, maintenance, support and education' to the discretion of Ms. Whiteneck"; and the "record supports the finding that the purchase of the Kropf Road house was Ms. Whiteneck's valid exercise of that discretion." Thus, in the trial court's view, "Ms. Whiteneck's actions were in accordance with the terms of the trust." The trial court also noted that, in its view, to "find otherwise would either be an exercise in second-guessing Ms. Whiteneck's decision about how best to care for herself or in illogically restricting the definition of health, maintenance or support." The trial court determined that "plaintiff has failed to demonstrate that she had a legal right to Seagate free from encumbrances."

The trial court further determined that the "agreement between Ms. Whiteneck and defendants included implicit and explicit obligations on the part of defendants." As explained by the trial court, the Nippings

"had agreed to care for, support, and maintain Ms. Whiteneck in her remaining years. By sharing a home with Ms. Whiteneck, [the Nippings] would provide companionship, security and consistency for her. They entered into this obligation not knowing what the future would hold for Ms. Whiteneck. They were potentially agreeing to an extended period of care for an elderly and potentially ill person. It is not inequitable under the circumstances that the defendants obtained the Kropf property."

## II.   ANALYSIS

I begin my analysis by noting the points on which I agree with the majority.

I agree with the majority that the trust in this case is governed by California law. 310 Or App at 786. And I also agree with the majority that,

"[u]nder California law, the trustee has a duty to administer the trust according to the trust instrument. In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it. Ordinary words must be given their normal, popular meaning and legal

terms are presumed to be used in their legal sense. The trustee also must deal impartially with all beneficiaries, and, if given discretionary power, the trustee must exercise his or her power reasonably. Even if a trustee is given 'sole' and 'absolute' discretion, he or she must act in accordance with fiduciary principles and must not act in bad faith or in disregard of the purposes of the trust."

*Id.* (internal quotation marks and citation omitted).

Additionally, as noted above, with regard to Trust B, Article 2.11 of the trust provided:

"DISCRETION TO INVADE PRINCIPAL  *If the trustee deems income payments to be insufficient*, the trustee shall, from time to time, pay to or apply for the benefit of the surviving trustor, a sum out of the principal of Trust B *as the trustee, in the trustee's discretion, deems necessary for the trustor's proper health, maintenance, support and education*. Such payment may be made after Trust A has been exhausted, or before Trust A is exhausted."

(Emphases added.)

I agree with the majority that, under that provision, Ms. Whiteneck could withdraw Trust B principal only if she deemed Trust B income payments insufficient to provide for her health, education, maintenance, and support (HEMS) needs. 310 Or App at 786.

I part ways with the majority, however, because I disagree with the majority's conclusion that the trial court "erred in concluding that [Ms. Whiteneck's] invasion of the trust principal to buy the Kropf property and deed it to herself and defendants comported with the terms of the trust." *Id.* at 790. The majority so concludes because, in its view, the "evidence does not allow a reasonable inference that the condition precedent for invading Trust B principal had been met—that is, that [Ms. Whiteneck] had deemed the Trust B income payments 'insufficient' to meet [her] HEMS needs and deemed it 'necessary' to invade the principal to provide for those needs." *Id.* at 789. "Relatedly," the majority concludes that "the evidence does not permit a finding that [Ms. Whiteneck] and defendants had agreed not only to live together but that defendants would be responsible for [Ms. Whiteneck's] care, maintenance, and support in exchange

for an immediate one-half-interest in the Kropf property and a future one-half interest to be acquired by devise." *Id*.

In rejecting the trial court's understanding of the record, I believe the majority too quickly discounts the relationship, and the bonds of caretaking and support, that had formed between Ms. Whiteneck and the Nippings; Ms. Whiteneck's ever-increasing reliance on the Nippings to provide for her HEMS needs as she grew older and her memory continued to fail; and the Nippings concomitant willingness to meet such increasing needs, evinced by their actions over the course of a decade. In my view, it is apparent that the Nippings had assisted in providing for Ms. Whiteneck's health, maintenance, and support in an ever-increasing way for many years, and Ms. Whiteneck had necessarily come to rely on them for such care. And, as explained below, in my view, the evidence was legally sufficient to support a finding that Ms. Whiteneck "deemed it necessary" to withdraw principal from Trust B to meet her HEMS needs and that her income from Trust B was insufficient to meet those needs.

As recounted above, the following occurred before Ms. Whiteneck moved to Oregon: Ms. Nipping visited Ms. Whiteneck the day after Ms. Whiteneck's husband died in 1999, and Ms. Nipping and her family visited Ms. Whiteneck frequently thereafter until the Nippings moved to Oregon in 2005; Ms. Whiteneck had mild dementia; when Ms. Whiteneck fell in 2007, Ms. Nipping traveled to California from Oregon and arranged for a care provider to periodically go to Seagate to check on Ms. Whiteneck and spend time with her, and that care provider "reported to" Ms. Nipping, not to Ms. Whiteneck; Ms. Whiteneck's friend called Ms. Nipping when she felt that Ms. Whiteneck was becoming increasingly isolated in California and believed that Ms. Whiteneck should move to Oregon; Ms. Whiteneck was excited to move to Oregon because it would mean she could be closer to the Nippings; and, in preparation for Ms. Whiteneck's move to Oregon, the Nippings looked for assisted living facilities in which Ms. Whiteneck could live, ultimately finding one that was decorated like Seagate.

After Ms. Whiteneck moved to Oregon: Ms. Whiteneck lived with the Nippings for a time until a vacancy opened up at the assisted living facility that she was to move into; Ms. Nipping attended a doctor's appointment with Ms. Whiteneck and gave the doctor information concerning Ms. Whiteneck's memory loss, specifically, that Ms. Whiteneck's memory had been getting progressively worse over the course of the prior two years; the Nippings managed Ms. Whiteneck's finances, including arranging for Seagate to be rented, and hired an accountant to file Ms. Whiteneck's taxes; Ms. Whiteneck switched assisted living facilities to be closer to the Nippings after the Nippings found a facility closer to their home that they believed Ms. Whiteneck would prefer; the Nippings visited Ms. Whiteneck frequently at the assisted living facilities at which she stayed; Ms. Whiteneck went to the Nippings home for all of the holidays and attended her great-grandchildren's "evening activities" with the Nippings; and Ms. Whiteneck shared articles she found interesting with Ms. Nipping.

It is against that backdrop—*i.e.*, the Nippings caring for Ms. Whiteneck and Ms. Whiteneck relying on such care— that, when the Nippings decided to move to the Portland area from Creswell, they approached Ms. Whiteneck about moving in with them, and Ms. Whiteneck decided to do so. To effectuate moving into the property that was chosen for that purpose, it was necessary for Ms. Whiteneck to withdraw principal from Trust B, and the only asset of Trust B was Seagate. Ms. Whiteneck and the Nippings were informed by the title company that, to borrow against Seagate, Seagate needed to be removed from the trust, encumbered, and then placed back into the trust, which is precisely what occurred.

With that understanding of the record—and, in particular, the relationship of caretaking and support between the Nippings and Ms. Whiteneck, that Ms. Whiteneck had come to rely on the Nippings for her HEMS needs, that the Nippings were moving from Creswell to the Portland area, and that the Kropf Property transaction required Ms. Whiteneck to withdraw from the principal of the Trust B—the evidence was legally sufficient to support a finding that Ms. Whiteneck "deemed it necessary" to withdraw

principal from Trust B to meet her HEMS needs and that her income from Trust B was insufficient to meet those needs.[6]

Support and maintenance are "not limited to the bare necessities of life." 26 CFR § 20.2041-1(c)(2). And the importance of companionship, security, and consistency for the elderly—which the Nippings provided to Ms. Whiteneck in spades—cannot be overstated.[7]

---

[6] In the majority's view, "if the terms of the trust had been followed, the trustee presumably could have sold or encumbered Seagate while leaving it in trust." 310 Or App at 787 n 2. But, on this record, it would be speculation, not a presumption, for us to determine both that Ms. Whiteneck (1) could have sold or encumbered Seagate while leaving it in the trust and still effectuated the transaction and (2) that she was aware that she could have effectuated the transaction while leaving Seagate in the trust, and thus would not have deemed it "necessary" to undertake the Kropf Property transaction in the manner that it was undertaken.

In any event, it was Ms. Cumming, not the Nippings, who bore the burden of proof in this case. No evidence that the trial court was required to credit suggests that the transaction in this case could have been effectuated in the manner the majority presumes it could have been effectuated.

[7] The importance of maintaining strong familial relationships as people age is well-documented, as are the positive effects that those relationships have on the health of the elderly; the negative effects associated with the absence of those relationships are also well-documented. *See generally* Preeti Malani, *Only the Lonely: Poll Shows Many Older Adults, Especially Those with Health Issues, Feel Isolated*, Michigan Institute for Healthcare Policy & Innovation News (Mar 4, 2019), https://ihpi.umich.edu/news/only-lonely-poll-shows-many-older-adults-especially-those-health-issues-feel-isolated (accessed Jan 5, 2021) ("[N]ew findings amplify research that has shown links between chronic loneliness and health issues ranging from memory loss to shorter lives."); Hearings on Aging without Community: The Consequences of Isolation and Loneliness Before the S Spec Comm on Aging, 115th Cong, 1st Sess, 5-6 (Apr 27, 2017) (statement of Julianne Holt-Lunstad, Ph.D., Professor of Psychology and Neuroscience, Brigham Young Univ) ("[Isolation has] a consistent and significant effect on mortality risk, and the magnitude is comparable and in many cases exceeds that of other well-accepted risk factors, including smoking up to 15 cigarettes per day, obesity, and air pollution."); Harvard Health Publishing, *Can Relationships Boost Longevity and Well-being?*, Harvard Health Letter (June 2017), https://www.health.harvard.edu/mental-health/can-relationships-boost-longevity-and-well-being (accessed Jan 5, 2021) ("People who are more socially connected to family, friends, and community are happier, healthier, and live longer than people who are less well connected."); Leland Kim, *Loneliness Linked to Serious Health Problems and Death Among Elderly: UCSF Researchers Find Social Factors Play Major Role in Older Adults' Health*, UCSF News (June 18, 2012), https://www.ucsf.edu/news/2012/06/98644/loneliness-linked-serious-health-problems-and-death-among-elderly (accessed Jan 5, 2021) ("[L]oneliness is independently associated with an increased rate of death and functional decline."); John T. Cacioppo, *Loneliness: Human Nature and the Need for Social Connection* 108 (2008) ("[W]e see loneliness on the list of serious risk factors for illness and early death, right alongside smoking, obesity, and lack of exercise."); Sightlines Project, Stanford

Additionally, in my view, the evidence was legally sufficient for the trial court to determine that there was an agreement between Ms. Whiteneck and the Nippings, which "included implicit and explicit obligations on the part of" the Nippings, and under which that the Nippings "had agreed to care for, support, and maintain Ms. Whiteneck in her remaining years."

The agreement between the Nippings and Ms. Whiteneck is evidenced by the Nippings actions *vis-à-vis* Ms. Whiteneck historically, which included assisting her with her health, maintenance, and support, thereby demonstrating their willingness to provide such care for Ms. Whiteneck after she moved in with them. It is also evidenced by their offer to Ms. Whiteneck, who, at the time, was living in an assisted living facility, to come live with them at the Kropf Property if they were able to secure the property. In my view, it strains credulity to posit that the Nippings were *not* agreeing to assist in providing for Ms. Whiteneck's HEMS needs when, knowing she was presently living in an assisted living facility, they offered her the opportunity to move in with them.

The agreement between the Nippings and Ms. Whiteneck is further evidenced by the Nippings' actions following the purchase of the Kropf Property: As agreed to by the Nippings and Ms. Whiteneck prior to purchase of the Kropf Property, the Nippings undertook to renovate the Kropf Property, including Ms. Whiteneck's bedroom for Ms. Whiteneck's use; the Nippings periodically updated Ms. Whiteneck with information concerning the renovations; when Ms. Whiteneck went to the hospital in December 2010, Ms. Nipping communicated with hospital staff regarding her condition; when Ms. Whiteneck was placed on hospice, the Nippings arranged for Ms. Whiteneck's transport to the Kropf Property; Ms. Whiteneck met with a hospice worker for several hours to discuss what Ms. Whiteneck

---

Center on Longevity, Stanford University, Social Engagement, https://longevity.stanford.edu/social-engagement/ (accessed Jan 21, 2021) ("Mounting evidence consistently demonstrates the relationship between social engagement and higher levels of physical, mental, and cognitive functioning and its association with longer life spans. By contrast, socially isolated individuals face health risks comparable to those of smokers. Their mortality risk is twice that of obese individuals.").

would need and what Ms. Nipping would need to do for her; Ms. Nipping slept in Ms. Whiteneck's sitting room at the Kropf Property on Christmas night so that she was close to Ms. Whiteneck; and Ms. Nipping, Mr. Nipping, and one of Ms. Whiteneck's great-grandchildren, H. Nipping, stayed with Ms. Whiteneck when she passed.

Thus, as I see it, legally sufficient evidence supports a determination that, part and parcel with Ms. Whiteneck moving out of assisted living and in with the Nippings on the Kropf Property, there was an agreement that the Nippings would assist Ms. Whiteneck with her HEMS needs—potentially for an extended period of time. That is, when the Nippings invited Ms. Whiteneck to live with them, it was not merely to "include stepmother in their family meals and the like." 310 Or App at 791 n 5.

Finally, I observe that, given the majority's analysis, the majority does not reach the issue of whether "it would have been an abuse of discretion for [Ms. Whiteneck] to invade principle in the manner that she did *even if* she had deemed it necessary and had an agreement with [the Nippings] to provide for her care." 310 Or App at 789 n 3 (emphasis in majority). For the purposes of this dissent, it suffices to say that, on this record, given our standard of review, I would determine that Ms. Whiteneck did not abuse her discretion as trustee. *In re Greenleaf's Estate*, 101 Cal App 2d 658, 662, 225 P2d 945, 948 (1951) ("[T]he basic inquiry, whenever the exercise of a trustee's discretion, absolute or otherwise, is challenged, is always whether the trustee acted in the state of mind contemplated by the trustor.").

In contending that the "evidence does not allow a reasonable inference that the condition precedent for invading Trust B principal had been met—that is, that [Ms. Whiteneck] had deemed the Trust B income payments 'insufficient' to meet her HEMS needs and deemed it 'necessary' to invade the principal to provide for those needs" 310 Or App at 789—the majority makes a number of arguments and observations, none of which, in my view, are dispositive as to the issues before us. I address three such arguments and observations below.

First, the majority notes that it is "undisputed that [Ms. Whiteneck] had sufficient income to fully cover living costs and bills." *Id.* at 787.

It is true that it is undisputed that Ms. Whiteneck's bills and rent at the assisted living facility at which she lived were fully paid for by pension benefits and social security that Ms. Whiteneck received. But, with regard to whether Ms. Whiteneck could withdraw from the principal of Trust B, the question before the trial court was not whether Ms. Whiteneck's income *in toto* was sufficient to pay for her HEMS needs. Instead, it was whether her income *from Trust B* was sufficient to pay for her HEMS needs and whether she deemed it necessary to withdraw principal from Trust B to pay for those needs. That is, under the terms of Trust B, Ms. Whiteneck could deem it "necessary" to withdraw principal from Trust B to cover her HEMS needs, notwithstanding that she had assets other than Trust B principal available to her for her HEMS needs. *See* 26 CFR § 20.2041-1(c)(2) ("In determining whether a power is limited by an ascertainable standard, it is immaterial whether the beneficiary is required to exhaust his other income before the power can be exercised.").

In this case, Ms. Whiteneck's income from Trust B consisted of the income from the rental of Seagate (which was the only asset of Trust B) and amounted to approximately $2,000 per month. 310 Or App at 782. In my view, Ms. Whiteneck could have deemed $24,000 a year (*i.e.*, the income payments from Trust B) insufficient to provide for her HEMS needs—particularly in view of her living at an assisted living facility—satisfying that condition precedent to withdraw the principal of Trust B.

Second, the majority observes that the Nippings' offer to live with Ms. Whiteneck was not expressly "contingent" upon Ms. Whiteneck giving the Nippings "a 50-percent or 100-percent interest in the Kropf property or otherwise paying them" and that Ms. Nipping testified that she understood the interest in the Kropf Property deeded to the Nippings to be a "gift." *Id.* at 788. But the fact that Ms. Whiteneck had no legal obligation to transfer the Kropf Property to the Nippings by deed and devise does not mean

that the trial court could not determine, on this record, that Ms. Whiteneck deemed doing so necessary for her HEMS needs.

Third, the majority argues that, in its view, the "trust specifically provided that [Ms. Whiteneck] could sell Seagate and buy a replacement home of comparable or lesser value," and that that "replacement home would necessarily be a trust asset." *Id.* at 787. To be sure, Article 2.12 of the trust allowed Ms. Whiteneck to sell Seagate, but I do not understand it to compel Ms. Whiteneck to purchase a replacement home for herself in the event that she sold Seagate, or require that a property purchased for her HEMS needs be made a trust asset, particularly where purchasing such property for her HEMS needs as a trust asset was not an apparent option.

In sum, I would conclude that the trial court did not err when it determined that "Ms. Whiteneck's actions were in accordance with the terms of the trust" and that to "find otherwise would either be an exercise in second-guessing Ms. Whiteneck's decision about how best to care for herself or in illogically restricting the definition of health, maintenance or support." Thus, in my view, the trial court did not err when it determined that "plaintiff has failed to demonstrate that she had a legal right to Seagate free from encumbrances."

In light of the foregoing, I respectfully dissent.